UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-cv-61159-BLOOM

JOEL JASMIN,

    Petitioner,

v.

FLORIDA DEPARTMENT OF
CORRECTIONS,

    Respondent.
_____/

## ORDER DISMISSING 28 U.S.C. § 2254 PETITION AS TIME BARRED

**THIS CAUSE** is before the Court on Petitioner Joel Jasmin's *pro se* Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254. ECF No. [1]. Petitioner, a state prisoner, challenges his convictions and sentences in Case No. 09-20924-CF-10A in the Seventeenth Judicial Circuit in and for Broward County, Florida. This Court has considered the Petition, the State's Response to the Order to Show Cause, ECF No. [11], Petitioner's Reply, ECF No. [17], and the state court record. After careful consideration, the Petition is **DISMISSED** as time barred and procedurally defaulted.[1]

**I.   BACKGROUND**

On December 9, 2009, Petitioner was charged by information with (1) burglary of an unoccupied dwelling; and (2) grand theft. Resp't Ex. 3, ECF No. [12-1] at 16–17. Prior to trial, Petitioner was adjudged incompetent to proceed. Resp't Ex. 4, *id*. at 18. The state trial court later

---

[1] The dismissal of a § 2254 petition as time bared or procedurally defaulted is with prejudice and is a merits adjudication for purposes of successiveness. *See Jordan v. Sec'y, Dep't of Corr.*, 485 F.3d 1351, 1353 (11th Cir. 2007).

found Petitioner competent, and he proceeded to trial on February 29, 2016. Resp't Ex. 5, *id*. at 19; *see also* Trial Tr., ECF No. [14-1].

A jury found Petitioner guilty on both counts. Resp't Ex. 7, ECF No. [12-1] at 39–40. The state trial court sentenced Petitioner to 15 years and one day in state prison as a prison release reoffender and a habitual felony offender. Resp't Ex. 8, 10, *id*. at 41–51, 53–55. Petitioner appealed, and the Fourth District Court of Appeal ("Fourth DCA") affirmed, *per curiam*, without a written opinion. *See Jasmin v. State*, 257 So. 3d 131 (Fla. 4th DCA 2018).

On July 29, 2019, Petitioner filed his first motion for post-conviction relief under Florida Rule of Criminal Procedure 3.850, raising a claim of ineffective assistance of counsel. Resp't Ex. 16, ECF No. [12-1] at 164–70. The state trial court denied the motion without an evidentiary hearing, and the Fourth DCA affirmed, *per curiam*, issuing its mandate on the denial of rehearing on November 20, 2020. Resp't Exs. 18–28, *id*. at 253–324.

On December 29, 2021, Petitioner, through counsel, filed a motion for new trial based on newly discovered evidence. Resp't Ex. 29, *id*. at 325–26. Petitioner claimed that his newly discovered evidence was a private investigator's report that cast doubt on the testimonies of the two detectives who arrested him. *See id*. The state trial court denied the motion for failing to meet the procedural requirements of Rule 3.850, finding that the private investigator's report did not qualify as newly discovered evidence because the investigator's findings could have been discovered with reasonable diligence prior to trial. Resp't Ex. 30, *id*. at 348–50.

On April 28, 2022, Petitioner, proceeding *pro se*, filed a successive motion for post-conviction relief, again relying on his purported newly discovered evidence. Resp't Ex. 35, *id*. at 359–82. The state trial court again ruled that the evidence could have been discovered prior to trial, and it denied the motion as untimely. Resp't Ex. 38, *id*. at 441–43. The Fourth DCA affirmed, *per curiam*. *See Jasmin v. State*, 384 So. 3d 769 (Fla. 4th DCA 2024).

On June 28, 2024,[2] Petitioner filed the instant Petition pursuant to 28 U.S.C. § 2254. ECF No. [1]. The Petition raises a single claim: "Petitioner has uncovered new reliable evidence which demonstrates his actual innocence and reveals a *Giglio* violation." *Id*. at 4. The State responded, arguing that this claim is time barred, procedurally defaulted, and without merit. ECF No. [11]. Petitioner filed a Reply. ECF No. [17]. The matter is ripe for review.

## II.     LEGAL STANDARD

To obtain federal habeas relief, a state prisoner must show that he "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Court may grant habeas relief only if the state court's decision on the merits of the federal claim was: (1) "contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented" in the state court proceeding. § 2254(d)(1)–(2). This standard is highly deferential to state court decisions. *Wilson v. Sellers*, 584 U.S. 122, 125 (2018); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

"A decision is 'contrary to' clearly established federal law if the state court applied a rule that contradicts governing Supreme Court precedent, or if it reached a different conclusion than the Supreme Court did in a case involving materially indistinguishable facts." *James v. Warden*, 957 F.3d 1184, 1190 (11th Cir. 2020) (citing *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000)). A state court decision involves an "unreasonable application of clearly established federal law" if prior Supreme Court decisions "clearly require[d] the state court" to reach a different result. *Kernan v. Cuero*, 583 U.S. 1, 3 (2017). A state court's decision is reasonable "so long as

---

[2] "Under the prison mailbox rule, a *pro se* prisoner's court filing is deemed filed on the date it is delivered to prison authorities for mailing." *Jeffries v. United States*, 748 F.3d 1310, 1314 (11th Cir. 2014) (quotation omitted). The Petition is stamped as received by prison authorities for mailing on June 28, 2024. *See* ECF No. [1] at 1.

3

'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). In addition, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." § 2254(e)(1).

## III.   DISCUSSION

Petitioner's claim is both untimely and procedurally defaulted. In addition, Petitioner has not demonstrated actual innocence to overcome the time bar or procedural default. Lastly, even if the Court could reach the merits of Petitioner's claim, it is without merit.

### A.  Timeliness

The State argues that the Petition is time barred, and Petitioner concedes that his claim is untimely. Under 28 U.S.C. § 2244(d)(1)(a), a petitioner has one year from "the date on which [his] judgment became final by the conclusion of direct review or the time for seeking such review" to file a federal habeas petition. Petitioner's judgment was affirmed *per curiam* without a written opinion on November 1, 2018. Thus, his conviction became final ninety days later, on January 30, 2019, when his time for filing a petition for writ of certiorari with the United States Supreme Court expired. *See Williams v. Sec'y, Fla. Dep't of Corr.*, 674 F. App'x 975, 976 (11th Cir. 2017) (when a Florida district court of appeal affirms a conviction *per curiam*, discretionary review with the Florida Supreme Court cannot be sought and the conviction becomes final ninety days later, when the time for filing a petition for writ of certiorari expires).

Under § 2244(d)(2), the statute of limitations is tolled for "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2). After Petitioner's conviction became final, the statute of limitations ran untolled for 180 days until July 29, 2019, when he filed

his first motion for post-conviction relief under Rule 3.850. Resp't Ex. 16, ECF No. [12-1] at 164. The statute of limitations remained tolled until November 20, 2020, when the Fourth DCA issued its mandate denying Petitioner's motion for rehearing. Resp't Ex. 28, *id*. at 324; *see San Martin*, 633 F.3d at 1266 ("[t]he AEDPA clock resumes running when the state's highest court issues its mandate disposing of the motion for post-conviction relief"). The statute of limitations then ran untolled for another 404 days until December 28, 2021, when Petitioner filed his next post-conviction motion, his motion for new trial based on newly discovered evidence. Resp't Ex. 29, ECF No. [12-1] at 325–26. The statute of limitations thus ran untolled for more than 365 days and the Petition is untimely under § 2244(d)(1)(A).

In addition, § 2244(d)(1)(D) provides that a petition is timely if filed within one year of "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D). Petitioner may not avail himself of this provision because the state court found that he did not exercise due diligence in discovering the facts underlying his claim. In his motion for new trial based on newly discovered evidence, Petitioner alleged that he hired a private investigator in August of 2021, who took photographs of the crime scene and produced a report that cast doubt on the truthfulness of the detectives' trial testimonies. Resp't Ex. 29, ECF No. [12-1] at 326. The state court found, however, that "[w]hile the private investigator may have photographed the scene and composed his report in 2021, these photographs could have been obtained well before [Petitioner's] trial in 2016. Furthermore, both [Petitioner] and defense counsel knew of the existence of the scene of the crime before trial." Resp't Ex. 30, *id*. at 349. This factual finding is presumed correct, and Petitioner offers no argument to rebut it by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1) ("a determination of a factual issue made by a State court shall be presumed to be correct. The

applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

Even if Petitioner did exercise due diligence, however, his claim would still be untimely because it was filed more than one year from September 17, 2021, the date on which Petitioner discovered the private investigator's report. *See* ECF No. [1] at 4. Moreover, none of Petitioner's state post-conviction motions filed in the interim tolled the statute of limitations because they were rejected by the state court as untimely or procedurally barred. *See Sweet v. Sec'y, Dep't of Corr.*, 467 F.3d 1311, 1318 (11th Cir. 2006) (a state post-conviction motion is not "properly filed" under § 2244(d)(2) and cannot toll the statute of limitations if it was rejected by the state court as untimely or procedurally barred). In sum, Petitioner's claim is time barred.

### B. Procedural Default

The State also argues that Petitioner's claim is procedurally defaulted because he failed to raise it in state court, and Petitioner does not contest this argument in his Reply. "A federal habeas court generally may consider a state prisoner's federal claim only if he has first presented that claim to the state court in accordance with state procedures." *Shinn v. Ramirez*, 596 U.S. 366, 371 (2022). To exhaust a federal claim, "a state prisoner [must] present the state courts with the same claim he urges upon the federal courts." *Picard v. Connor*, 404 U.S. 270, 275 (1971). "When the prisoner has failed to do so, and the state court would dismiss the claim on that basis, the claim is 'procedurally defaulted.'" *Id.*; *see also Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (unexhausted claims may be treated "as procedurally defaulted, even absent a state court determination to that effect, if it is clear from state law that any future attempts at exhaustion would be futile."). A petitioner may overcome a procedural default upon a showing of "cause" for the default and "actual prejudice" if the federal court were to decline to hear his claim. *Shinn*, 596 U.S. at 371.

Here, Petitioner never raised his claim in state court. The claim he now casts as a *Giglio* claim was presented in his state post-conviction motion as a newly discovered evidence claim. Petitioner therefore failed to exhaust his *Giglio* claim because a petitioner must present the *same* claim in state court that he raises in his federal habeas petition. *See Keys v. Sec'y, Dep't of Corr.*, 773 F. App'x 556, 561 (11th Cir. 2019) (holding that a petitioner's newly discovered evidence claim in his state post-conviction motion did not exhaust his federal *Giglio* claim because "[t]he federal analog of a Florida law newly discovered evidence claim is a *federal* newly discovered evidence claim").

Petitioner's claim is thus procedurally defaulted because he may not file a successive post-conviction motion raising a *Giglio* claim that could have been raised in his earlier motion. *See id*. ("Under Florida law, 'claims that could have been raised in a prior postconviction motion are procedurally barred.' Because Keys has deprived the Florida courts of the opportunity to consider his *Giglio* claim, he has procedurally defaulted it." (quoting *Rivera v. State*, 187 So. 3d 822, 832 (Fla. 2015))). Moreover, Petitioner makes no showing of cause and prejudice to overcome the procedural default. *See id*. (holding that the petitioner could not overcome the procedural default because "he ha[d] made no argument for cause and prejudice").

C. **Actual Innocence**

Petitioner claims he has "new reliable evidence" of his actual innocence. ECF No. [1] at 4. In its Response, the State argues that Petitioner cannot raise his actual innocence claim here because this claim was procedurally barred as untimely it in state court due to Petitioner's failure to exercise due diligence.[3] ECF No. [11] at 19. The State further argues that Petitioner's evidence

---

[3] The State is incorrect. Actual innocence is an exception to *overcome* a procedural default. *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013). A claim that was rejected in state court as procedurally barred may be heard on the merits in federal court if the petitioner can demonstrate actual innocence. *Id*.

is insufficient to establish his innocence because it is, at best, mere impeachment evidence. *Id*. at 20–21. In his Reply, Petitioner insists that his new evidence "amounts to more than mere impeachment evidence" and is "proof of [his] factual innocence." ECF No. [17] at 8–9.

A prisoner may overcome a time bar or a procedural default by making a "credible showing of actual innocence." *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013). Actual innocence is not a claim itself, but "serves as a gateway through which a petitioner may pass" to obtain federal review of his habeas claim, whether the impediment is a procedural bar or the statute of limitations. *Id*. at 386. The actual innocence burden is the same for both procedural defaults and time bars. *Id*.

The actual innocence gateway, however, "applies to a severely confined category: cases in which new evidence shows 'it is more likely than not that no reasonable juror would have convicted the petitioner.'" *Id*. at 395 (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). For a claim of actual innocence to be credible, a petitioner must "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. In assessing such evidence, "the district court is not bound by the rules of admissibility that would govern at trial[,]" and may "consider the probative force of relevant evidence that was either excluded or unavailable at trial." *Id*. at 327–28; *see also House v. Bell*, 547 U.S. 518, 538 (2006) ("*Schlup* makes plain that the habeas court must consider 'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'" ((citing *Schlup*, 513 U.S. at 328)). "Based on th[e] total record, the court must make 'a probabilistic determination about what reasonable, properly instructed jurors would do.'" *House*, 547 U.S. at 538 (citing *Schlup*, 513 U.S. at 329).

This Court's analysis of Petitioner's actual innocence claim proceeds in three parts. *See Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1150 (11th Cir. 2022) (employing a three-part analysis to an actual innocence gateway claim). First, the Court considers Petitioner's new evidence. Second, the Court examines the evidence of Petitioner's guilt, including, but not limited to, the evidence presented at trial. And third, the Court "analyze[s] whether, considering all this evidence, [Petitioner] has shown that no reasonable juror would have convicted him." *Id*.

### i. The private investigator's report

Petitioner's purported new evidence is a report from a private investigator, Dan Riemer. Resp't Ex. 35A, ECF No. [12-1] at 383–86. Riemer reviewed the trial evidence, investigated and took photographs of the crime scene—including the structure that Petitioner burglarized and its surrounding area—and rendered the following conclusions:

- Detective Moule could not have seen Petitioner climb through the bathroom window if he was parked on the 200 block of Northwest Eleventh Street because there is "only one location on the street where you could actually park" and "there is a solid wood fence along the east side of the property" that would have obstructed Detective Moule's view of the bathroom window.

- It would have been "highly difficult" for Petitioner, at 5'11" and 240 pounds, to climb through the bathroom window because "this window is high enough that you need tremendous upper body strength to even get through the window."

- Detective Moule testified that his partner, Detective Auguste, "went to the east side of the building, which he could not have gotten to easily without interrupting a burglary," and both detectives testified that they observed Petitioner "come out the front door" from the east side of the property. "None of this seems probable when viewing the photographs."

*Id*.

Riemer's conclusions, however, are refuted by the detectives' trial testimony and by his own photographs. Riemer's first conclusion that Detective Moule could not have seen Petitioner climb through the bathroom window is refuted by his photographs showing that a person parked on the north side of the property on Northwest Eleventh Street—where Moule testified he was

parked—could have easily seen through the chain link fence surrounding the property and viewed the east side of the structure where the bathroom window was located. *See* ECF No. [12-1] at 398–400. The "solid wood fence" to which Riemer refers divides the property with the neighboring lot to the east and does not obstruct the view from directly to the north of the property. *See id*. at 398 (photograph of the property taken from the 200 block of Northwest Eleventh Street, directly north of the property, showing a mostly unobstructed view of the east wall of the structure). This wood fence runs perpendicular to the street and would have obstructed Detective Moule's view only if he was parked down the street to the east of the property. In other words, Riemer's photographs confirm that Detective Moule could have parked at a vantage point that gave him a clear view of Petitioner climbing through the bathroom window.

Riemer's report implies that Detective Moule could not have parked at this vantage point because there is "only one location on the street where you could actually park"—on the east side of the block—and the solid wood fence would have obstructed Moule's view from that location. *Id*. at 385; *see also id*. at 401 (photograph taken from Northwest Eleventh Street to the east of the property, showing a wood fence partially obstructing the view). But Riemer's own photographs again refute this assertion. These photographs show a grassy strip running alongside the entirety of the 200 block of Northwest Eleventh Street, on which a car could easily park. *See id*. at 401. Moreover, there is no reason to believe Detective Moule did not simply park his car on the street. Riemer's findings are based entirely on his unfounded assumption that Detective Moule parked at a vantage point where he could not see the bathroom window. There is no evidence to support this assumption. Indeed, Moule testified that he was parked on the 200 block of Northwest Eleventh Street, but he did not specify where on that block he was parked. *See* Trial Tr., ECF No. [14-1] at 247:13–15. Riemer's conclusion that Detective Moule could not have seen the burglary is refuted by Moule's testimony and Riemer's own photographs.

Second, Riemer's conclusion that it would have been "highly difficult" for Petitioner, at 5'11" and 240 pounds, to climb through the bathroom window, is speculative and not supported by any reliable evidence. First, none of Riemer's photographs clearly indicate the height or size of the bathroom window. One of Riemer's photographs purportedly shows a bathroom window, but there is nothing in the record substantiating that this was the window through which Detective Moule observed the burglar climb. *See id*. at 395 (photograph purportedly showing the bathroom window on the east side of the structure). Second, even if Petitioner did need "tremendous upper body strength" to get through this window, there is no evidence suggesting that Petitioner, who was thirty-seven at the time of the burglary, did not possess the requisite upper body strength. A reasonable juror could have also inferred that Petitioner used an assist to climb through the window, like a stool or a ladder. And third, considering it was dark and Detective Moule was across the street, a reasonable juror could have also concluded that Detective Moule saw Petitioner climbing through *some* window, but not necessarily the bathroom window. There was no evidence taken from the crime scene itself confirming which window the burglar used. Had Detective Moule been mistaken about which window Petitioner used, it would not have cast doubt on Petitioner's guilt considering the remaining evidence.

Lastly, according to Riemer's report, Detective Moule testified that his partner, Detective Auguste, "went to the east side of the building," which would have "interrupt[ed] [the] burglary[.]" *Id*. at 385. Riemer also states that neither detective could have "observed [Petitioner] come out the front door" because they were on the east side of the building. *Id*. These conclusions make little sense because neither detective testified that they went to the east side of the building. Detective Moule stated that he was on Northwest Eleventh Street, to the north of the property, and Detective Auguste testified that he was on Northwest Third Avenue, to the west of the property. Trial Tr.,

11

ECF No. [14-1] at 247 13–15; 271:2–3. Detective Auguste testified that he observed Petitioner exiting the property from Northwest Third Avenue. *Id*. at 271:7–8.

In sum, the findings in Riemer's report are refuted by the evidence or otherwise incredible and based on speculation. Moreover, as explained below, even if the Court were to accept these findings as true, they are at best impeachment evidence and do not establish Petitioner's innocence.

### ii.     The evidence of Petitioner's guilt

At trial, Detective Moule gave the following testimony. While surveilling the area on Northwest Eleventh Street, he observed Petitioner walking down the street behaving suspiciously. Trial Tr., ECF No. [14-1] at 247:7–21. Detective Moule then saw Petitioner enter the subject property through an open gate in the chain link fence surrounding the property. *Id*. at 249:16–20; 260:11–19. Petitioner removed a screen on a bathroom window and entered one of the structures. *Id*. at 250:2–6; 261:9–17. Petitioner was inside for about five minutes and then left carrying a red recycling bin containing miscellaneous tools. *Id*. at 252:9–10. Detective Moule and his partner, Detective Auguste, intercepted Petitioner, who was cooperative. *Id*. at 252:9–14. Detective Moule contacted the property owner, who confirmed that the tools in the bin were his.[4] *Id*. at 253:24–254:13. While Detective Moule was transporting Petitioner to the police station, Petitioner said, "Man, I should of [sic] ran when y'all stopped me." *Id*. at 255:12–13. Detective Moule also investigated the crime scene but was unable to recover any fingerprints. *Id*. at 255:20–256:6.

Detective Auguste testified as follows. He was patrolling the area with Detective Moule and set up surveillance on the Third Avenue side of the property, around the corner from where Detective Moule was stationed. *Id*. at 270:5–271:4. Detective Auguste could not see Petitioner enter the property, but he saw Petitioner exit the property carrying a large plastic bin and relayed

---

[4] The property owner also testified at trial that the tools recovered belonged to him. *Id*. at 281:1–23.

this observation to Detective Moule. *Id*. at 271:5–22. He then met Detective Moule after Moule had stopped Petitioner. *Id*. at 273:16–21. Auguste observed power tools and equipment inside the red bin Petitioner was carrying. *Id*. at 274:10–13.

In addition to this trial testimony, the following evidence was excluded by the trial court but may be considered here. *See Schlup*, 513 U.S. at 328. First, the detectives testified that they were patrolling the area due to an increase in burglaries. Trial Tr., ECF No. [14-1] at at 227:21–228:2. Second, the property owner told the detectives that there were other items stolen, which were never recovered. *Id*. at 228:4–8. And third, Petitioner had two prior convictions for burglary. *Id*. at 230:8–17.

### iii. The private investigator's report in light of the entirety of the record

Upon consideration of the record as a whole, the Court finds that Petitioner's new evidence does not show that it is more likely than not that no reasonable juror would have convicted him. As mentioned, Riemer's report is not supported by any evidence. Even if this report were true, it provides no basis for an actual innocence claim because, at best, it only impeaches Detective Moule's testimony, and does nothing to discredit Detective Auguste's testimony. *See Calderon v. Thompson*, 523 U.S. 538, 563 (1998) (holding that newly discovered impeachment evidence, which is "a step removed from evidence pertaining to the crime itself," "provides no basis for finding" actual innocence). According to Riemer's report, Detective Moule could not have observed Petitioner enter the structure through a bathroom window. But Riemer's findings only pertain to Moule's testimony; the report has no bearing on Detective Auguste's testimony that he saw Petitioner exit the property holding a bin of tools. Thus, the report, even if true, could not support Petitioner's claim of innocence.

Crucially, the report does nothing to cast doubt on the main piece of evidence supporting Petitioner's guilt: the fact that he was carrying tools belonging to the property owner when he was

stopped by the detectives. In his Petition, Petitioner attempts to explain away this inculpatory fact. He claims he was simply "walking down the road" when he "happened to discover the bin just lying there, unattended." ECF No. [1] at 6. Petitioner alleges that when he "began inspecting the contents of the recycle bin, that's when the detectives jumped out on him." *Id*.

These unsupported allegations, of course, are not evidence of actual innocence. *See Schlup*, 513 U.S. at 324 (an actual innocence claim must be supported by "new reliable evidence"); *Patterson v. McDonough*, No. 4:06CV138-WS, 2007 WL 1577859, at *6 (N.D. Fla. May 31, 2007) ("Petitioner's unsupported allegations of perjury and misconduct are insufficient to make a showing of actual innocence"). But assuming Petitioner had testified at trial and given this explanation, his testimony would have been contradicted by Detective Auguste's testimony that he saw Petitioner exit the premises carrying the bin. A reasonable juror would have been free to reject Petitioner's testimony in favor of Detective Auguste's testimony. *See United States v. Mateos*, 623 F.3d 1350, 1362 (11th Cir. 2010) ("A defendant who chooses to testify runs the risk that the jury will disbelieve her testimony, and 'runs the risk that if disbelieved the jury might conclude the opposite of her testimony is true.'" (quoting *United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995)) (alterations adopted)).

Finally, Petitioner highlights two pieces of evidence that were excluded at trial, which he contends show his innocence. First, according to Petitioner, the fact that the property owner told police that other items were missing and never recovered suggests that "someone other than Petitioner burglarized [the structure], took the tools they wanted from the recycle bin, and then discarded the bin on the ground near the structure." ECF No. [1] at 6. This explanation, however, like Petitioner's claim that he was just "walking down the road" when he discovered the bin, is at odds with Detective Auguste's testimony that he saw Petitioner exit the premises with the bin. Moreover, there are numerous other plausible inferences a juror could have drawn from this

information; for instance, Petitioner might have discarded these items before he was stopped, or the structure might have been burglarized on a separate occasion. Indeed, it was defense counsel who moved to exclude testimony about the missing items, reasoning that it was prejudicial to the defense. Resp't Ex. 17D, ECF No. [12-1] at 207.

Second, Petitioner claims that Riemer's investigation revealed that, based on criminal activity records, the detectives were not surveilling the area due to an increase in burglaries. *Id*. But Riemer's report makes no such finding. It states that he requested burglary reports from the police department and that these reports "will either show that there were numerous burglaries prior to this incident, or that [the detectives] were not sitting in surveillance because of burglaries in that area." ECF No. [12-1] at 386. Appended to Riemer's report are criminal activity records but no mention of whether they show an increase in burglaries. *Id*. at 403–428. In any event, Petitioner does not explain how the detectives' purportedly pretextual reason for surveilling the area supports his innocence. The reason the detectives were in the area is immaterial to Petitioner's guilt.

In sum, Petitioner has not shown that in light of the private investigator's report, no reasonable juror would have found him guilty of burglary. Accordingly, Petitioner's actual innocence claim fails.

### D.  Merits

Finally, the State argues that even if Petitioner could pass through the actual innocence gateway, his substantive claim fails on the merits. ECF No. [11] at 21–24. Petitioner raises a claim under *Giglio v. United States*, 405 U.S. 150 (1972), contending that Riemer's report proves that both Detective Moule and Detective Auguste testified falsely at his trial. ECF No. [1] at 7–10. The State contends that this claim fails because Riemer's report does not establish that these detectives testified falsely. ECF No. [11] at 24. In his Reply, Petitioner again asserts that the report shows he

is innocent of the burglary and demonstrates a *Giglio* violation. ECF No. [17] at 4–10.

"To establish a *Giglio* claim, a habeas petitioner must prove: (1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material, *i.e.*, that there is any reasonable likelihood that the false testimony could have affected the judgment." *Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1348 (11th Cir. 2011) (quoting *Ford v. Hall*, 546 F.3d 1326, 1332 (11th Cir. 2008)). "*Giglio* error is a species of *Brady* error that occurs when 'the undisclosed evidence demonstrates that the prosecution's case included perjured testimony and that the prosecution knew, or should have known, of the perjury.'" *Ventura v. Att'y Gen., Fla.*, 419 F.3d 1269, 1276–77 (11th Cir. 2005) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)).

Petitioner does not allege that the prosecution knew or should have known that the detectives' testimony was false. *See Davis v. Terry*, 465 F.3d 1249, 1253 (11th Cir. 2006) (rejecting a habeas petitioner's *Giglio* claim because he "fail[ed] to make any specific allegations tending to show that the government knew [its witness's] statement to be false"). But even if Petitioner had alleged that the prosecution knew or should have known that this testimony was false, his claim is refuted by the record because, as explained above, Riemer's report does not show that the detectives testified falsely. Thus, Petitioner's *Giglio* claim fails on the merits.

## IV.     EVIDENTIARY HEARING

Petitioner is not entitled to an evidentiary hearing because he has not alleged specific facts that, if true, would entitle him to habeas relief. *Allen v. Sec'y, Fla. Dep't of Corr.*, 611 F.3d 740, 763 (11th Cir. 2010) ("Having alleged no specific facts that, if true, would entitle him to federal habeas relief, [Petitioner] is not entitled to an evidentiary hearing.").

## V.      CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that:

Case No. 24-cv-61159-BLOOM

1. The Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, **ECF No. [1]**, is **DISMISSED as time barred and procedurally defaulted**.

2. A certificate of appealability is **DENIED** because Petitioner has failed to make a substantial showing of the denial of a constitutional right. *See* § 2253(c)(2); *Slack v. McDaniel,* 529 U.S. 473, 484–85 (2000).

3. The Clerk is directed to **CLOSE** this case and mail a copy of this Order to Petitioner at the address of record.

4. To the extent not otherwise disposed of, any scheduled hearings are **CANCELED**, all pending motions are **DENIED AS MOOT**, and all deadlines are **TERMINATED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on November 18, 2024.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record via CM/ECF

Joel Jasmin, *PRO SE*
L59328
Moore Haven Correctional Facility
Inmate Mail/Parcels
Post Office Box 719001
Moore Haven, FL 33471